IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE ACF BASIN WATER LITIGATION | CIVIL ACTION FILE NO. 1:18-MI-43-TWT |

## OPINION AND ORDER

This action is before the Court on Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the National Wildlife Federation, the Florida Wildlife Federation, Apalachicola Bay and River Keeper, Inc.'s Complaint [Doc. 116], and Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the State of Alabama's Complaint [Doc. 117]. For the reasons set forth below, the Court GRANTS the Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the National Wildlife Federation, the Florida Wildlife Federation, Apalachicola Bay and River Keeper, Inc.'s Complaint [Doc. 116], and the Court GRANTS the Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the State of Alabama's Complaint [Doc. 117].

## I.    Background

On April 5, 2017, the State of Alabama filed its Complaint against Defendants U.S. Army Corps of Engineers; Robert M. Speer in his official

capacity as Acting Secretary of the U.S. Army; Douglas Lamont in his official capacity as senior official exercising the functions of the Assistant Secretary of the U.S. Army for Civil Works; Todd T. Semonite in his official capacity as Commander and Chief of Engineers for the U.S. Army Corps of Engineers; C. David Turner in his official capacity as Division Commander for the South Atlantic Army Corps of Engineers; and James A. Delapp in his official capacity as the District Commander for Mobile District of U.S. Army Corps of Engineers. Ala. Compl., [Doc. 1]. Alabama brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* and the Water Supply Act of 1958, 43 U.S.C. §§ 390b *et seq.*, to set aside the U.S. Army Corps of Engineers' adoption in 2017 of the Final Environmental Impact Statement ("Final EIS") for the Apalachicola-Chattahoochee-Flint ("ACF") River Basin Water Control Manual and Water Supply Storage Assessment. *Id.*

Similarly, on April 27, 2017, the National Wildlife Federation, the Florida Wildlife Federation and Apalachicola Bay and River Keeper, Inc. filed their Complaint against Defendants U.S. Army Corps of Engineers; Douglas Lamont in his official capacity as senior official exercising the functions of the Assistant Secretary of U.S. Army for Civil Works; Todd T. Semonite in his official capacity as Commander and Chief of Engineers for U.S. Army Corps of Engineers; and C. David Turner in his official capacity as Division Commander for South Atlantic Army Corps of Engineers. NWF Compl., [Doc. 7]. The Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C.

§§ 701 *et seq.*, the Water Resources Development Act of 2007, 33 U.S.C. § 2283(d), the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347, and the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-667e to set aside the Corps' Updated ACF River Basin Water Control Manual. The State of Georgia, Atlanta Regional Commission, City of Atlanta, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, City of Gainesville, and Gwinnett County have intervened as Defendants in both cases.

These actions arise from the U.S. Army Corps' operations of five reservoirs within the ACF River Basin, formed by the Apalachicola, Chattahoochee, and Flint rivers, their tributaries and their drainage areas. Ala. Compl., at ¶ 11. The Chattahoochee River forms a large portion of the eastern border between Alabama and Georgia. *Id.* at ¶ 12. The Chattahoochee River starts in Georgia, and flows southwest toward Alabama, where it flows south before emptying into Lake Seminole at the Florida-Georgia line. *Id.*

The Corps operates five reservoirs on the Chattahoochee River. The uppermost and largest of the reservoirs is Buford Dam, which impounds the Chattahoochee River to create Lake Lanier approximately 50 miles north of Atlanta. Final Environmental Impact Statement, Master Water Control Manual, Apalachicola-Chattahoochee-Flint River (ACF) Basin, Alabama, Florida, Georgia (December 2016), [Final EIS, at 2-26]. Below Lake Lanier, the Corps operates three dams along the Chattahoochee River on the Alabama

border, including West Point Dam (associated with West Point Lake), Walter

F. George Lock and Dam (associated with Walter F. George Lake), and George

Andrews Lock and Dam (associated with Lake George W. Andrews). Ala.

Compl., at ¶ 13. Approximately 2,800 square miles of the ACF River Basin lie

within Alabama's borders. *Id.* at ¶ 14. The Corps' southernmost project within

the ACF River Basin is Jim Woodruff Lock and Dam which impounds Lake

Seminole on the Florida-Georgia line. Final EIS, 1-1 to 1-2. Water released

from the Woodruff Dam forms the Apalachicola River in Florida. *Id.*

The U.S. Army Corps operates the ACF projects pursuant to "specific"

and "general" authorities established by Congress. Final EIS, 2-59 to 2-60.

Specific authorities are established in the original legislation authorizing

construction of a certain project. Final EIS at ES-1, 2-59 to 2-60. The

authorizing statutes usually refer to and incorporate "reports" that the Corps

presents to Congress as part of the authorization process to provide

recommendations regarding the benefits of the projects. Defs.' Motion for

Partial Judgment regarding NWF's Compl., [Doc. 116-1, at 5]. For the ACF

reservoirs, specific authorities include navigation, hydropower, flood control,

water supply, and fish and wildlife conservation. Final EIS, ES-1, 2-59 to 2-60.

General authorities supplement these specific authorities and apply to all

federal agencies or Corps reservoirs, including the Endangered Species Act and

the Fish and Wildlife Coordination Act. [Doc. 116-1, at 6].

Because authorized purposes often conflict, the Corps is required to develop a Master Manual to describe how it will operate the system to balance conflicting purposes. 33 U.S.C. § 709; Final EIS, ES-1 to ES-2. The Master Manual governs the operation of the five Corps reservoirs on the Chattahoochee River in the ACF Basin. Ala. Compl., ¶ 18. The Corps last official Master Manual for the ACF system was adopted in 1958. *Id.* at ¶ 19. While the Corps was conducting its ACF operations under the 1958 Manual, Congress passed, and the President signed, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, ("NEPA"). *Id.* at ¶ 20. The National Environmental Policy Act requires the Corps to issue an environmental impact statement concerning any significant changes to its ACF operations. *Id.*

The Corps proposed to amend the Master Manual in 1989 to accommodate the water supply needs of metropolitan Atlanta, but Alabama sued to block that plan in 1990. NWF's Compl., ¶¶ 81-82. The updated Master Manual was delayed by negotiations and litigation that did not conclude until 2011. *Id.* at ¶¶ 83-88. The litigation focused in large part on claims that water supply was not an "authorized purpose" of Lake Lanier. *Id.* at ¶ 88. In 2011, the Eleventh Circuit held in *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1192 (11th Cir. 2011) that water supply is an authorized purpose of Lake Lanier under the River and Harbor Act of 1946, which authorized the project for construction. The Court also held that the Corps must reconsider

the Georgia water supply request that they had erroneously denied based on lack of authority. *Id.* at 1192-1193.

Now, the National Wildlife Federation, the Florida Wildlife Federation, Apalachicola Bay and River Keeper, Inc. and the State of Alabama argue for judicial review of an update by the Corps to the Master Manual for the ACF River Basin. The updated Master Manual at issue is the culmination of the process triggered by the Eleventh Circuit's 2011 decision. In 2012, the Corps' Chief Counsel issued a legal opinion concluding that the Corps was fully authorized to grant Georgia's request, but that an environmental impact statement would need to be prepared before any decision could be made. NWF's Compl., ¶ 89.

In 2015, the Corps prepared a draft updated master manual and individual manuals. Ala.'s Compl., ¶ 24. It also prepared the draft environmental impact statement under NEPA and a water supply storage assessment allocating space at Lake Lanier for Georgia's water supply. *Id.* In the documents, the Corps proposed increasing the amount of Lake Lanier's water that metro Atlanta uses for water supply. *Id.* at ¶ 51. Some potential effects included reduced flows downstream and an adverse impact on dissolved oxygen, nitrogen and chlorophyll. *Id.* at ¶¶ 32, 45, 59. During the public comment period on the draft manual, Alabama and the Environmental Protection Agency objected to the aspects of the proposal concerning the impairment of applicable water quality standards. *Id.* at ¶¶ 25, 28.

Contrary to Alabama's and the EPA's concerns, the Corps issued a Final Environmental Impact Statement ("Final EIS") which analyzes the effects of the Corps' updated operations and concludes that the updated Master Manual will have a "negligible" effect on the Apalachicola River and Bay. NWF's Compl., ¶ 172; Final EIS, ES-42.  The EIS also acknowledges that the updated Master Manual could have "substantially adverse" effects on riverine fish and aquatic resources in reaches of the Chattahoochee River and "slightly adverse" to "substantially adverse" impacts on the phosphorous, nitrogen, and dissolved oxygen content in the Chattahoochee River. NWF's Compl., ¶ 210.

On March 30, 2017, the Corps issued a Record of Decision adopting the updated Master Manual through the guidance and support of the Final EIS. *Id.* at ¶ 23. The National Wildlife Federation, the Florida Wildlife Federation, Apalachicola Bay and River Keeper, Inc. and the State of Alabama filed complaints. The National Wildlife Federation, the Florida Wildlife Federation and Apalachicola Bay and River Keeper, Inc. jointly challenge the Master Manual, alleging that the Corps struck the wrong balance by giving too much weight to purposes such as water supply and hydropower generation and not enough to fish and wildlife conservation (the "National Wildlife Federation's Complaint"). Specifically, their Complaint alleges that the Master Manual should be set aside for three reasons: (1) Count I, alleging the EIS is legally insufficient; (2) Count II, alleging a violation of a provision of the Water Resources Development Act of 1986; and (3) Count III, alleging a violation of

provisions of the Fish and Wildlife Coordination Act of 1958. The Atlanta Regional Commission, the City of Atlanta, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, the City of Gainesville and Gwinnett County (the "Georgia Water Supply Providers"), who have intervened as defendants, move under Rule 12(c) for judgment on the pleadings as to Counts II and III of the National Wildlife Federation's Complaint, alleging that the asserted statutory duties in both counts do not exist. [Doc. 116-1].

The State of Alabama's Complaint alleges that the Master Manual should be set aside for five reasons: (1) Count I, alleging a violation of the Water Supply Act, 43 U.S.C. § 390b(e); (2) Count II, alleging unlawful abandonment and reordering of authorized project purposes; (3) Count III, alleging violation of the Clean Water Act and the Corps' implementing regulations, 33 U.S.C. § 1323(a); (4) Count IV, alleging violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; and (5) Count V, alleging violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). [Doc. 1]. The Georgia Water Supply Providers move under Rule 12(c) for judgment on the pleadings as to Counts III and portions of Count V of Alabama's Complaint, arguing that Alabama has failed to state a claim under Section 313(a) of the Clean Water Act because Alabama has not alleged that a specific, applicable "requirement" has been violated. [Doc. 117-1].

The State of Georgia and the Federal Defendants, including the United States Army Corps of Engineers, have each filed a Brief in Support of both Georgia Water Supply Providers' motions for partial judgment on the pleadings. [Docs. 119, 120].

## II.    Legal Standard

A motion for judgment on the pleadings is subject to the same standard as is a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citations and quotations omitted). In ruling on a motion to dismiss, the court must accept factual allegations as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975

(11th Cir. 1985), *cert. denied*, 474 U.S. 1082 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III.   Discussion

The Court will address the Georgia Water Supply Providers' Motions for Partial Judgment on the Pleadings regarding the National Wildlife Federation's Complaint and the State of Alabama's Complaint in turn.

### A.   Motion for Partial Judgment on the Pleadings Regarding National Wildlife Federation's Complaint

The Georgia Water Supply Providers move under Rule 12(c) for judgment on the pleadings as to Counts II and III of the National Wildlife Federation's Complaint because both Counts are based on statutory duties that the Defendants contend do not exist.

### 1.   Motion for Partial Judgment on the Pleadings Regarding Count II

In Count II, the Plaintiffs allege that the Corps violated Section 2283(d) of the Water Resources Development Act of 2007 because the Defendants did not include a "specific mitigation plan to address fish and wildlife losses and other ecological harms" in the Master Manual, Record of Decision or Final EIS. NWF's Compl., at ¶ 150. In 2007, Congress amended Section 2283(d)(1), adding the language emphasized in bold: "After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources

project to Congress in any report, **and shall not select a project alternative in any report**, unless such report contains . . . [a specific plan to mitigate damages to ecological resources]." 33 U.S.C. § 2283(d)(1). The provision requires the Corps to include a specific mitigation plan whenever the Corps determines the proposed project or project alternative will have more than "negligible adverse impact on ecological resources and fish and wildlife." *Id.* The Plaintiffs allege that this duty was triggered by a finding in the Final EIS that certain aspects of the Master Manual will have "substantially adverse" water quality impacts in limited reaches of the Chattahoochee River. NWF's Compl., at ¶ 210.

In their Motion for Partial Judgment on the Pleadings, the Georgia Water Supply Providers argue that Count II should be dismissed, insisting that Section 2283(d) does not apply to the Master Manual, Record of Decision or Final EIS because it applies only to "reports" submitted to Congress. [Doc. 116-1, at 12-13]. The Plaintiffs disagree, arguing that the statute applies to any report which selects a project alternative regardless of if the report is submitted to Congress and that the Master Manual, Record of Decision and EIS are considered "reports" under the statute. NWF's Resp., [Doc. 122, at 10-17].

"The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). "We assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of

its provisions." *Id.* at 1281. If the statute's language is ambiguous, meaning susceptible to more than one reasonable interpretation, the Court then turns to the canons of statutory construction. *See Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) (finding that the court's "authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction").

Here, the Court's job is to determine the meaning of the term "report" within the clause "and shall not select a project alternative in any report," in absence of a definition provided by the statute. 33 U.S.C. § 2283(d)(1). As the Plaintiffs see it, the clause refers to project alternatives in any report, regardless of whether the report is submitted to Congress. NWF's Resp., at 10-17. The Plaintiffs argue that the Master Manual, Record of Decision and Final EIS are reports within the meaning of the statute because they fall within the plain meaning of the term "report" as defined by Black's Law Dictionary *Id.* at 12. *See Report*, Black's Law Dictionary (11th ed. 2019) at no. 1, available at Westlaw) (defining "report" as "[a] formal oral or written presentation of facts or a recommendation for action"). As the Defendants see it, the clause should be read in conjunction with the preceding phrase which only refers to reports submitted to Congress. [Doc. 116-1, at 12-16]. The Defendants argue that the term "report" has a specialized meaning within the context of the Water

Resources Development Act, asserting that it is reserved for communications from the Corps to Congress, usually as part of the authorization process. *Id.*

The Court finds that Section 2283(d) is ambiguous, as it is susceptible to more than one reasonable interpretation. In construing an ambiguous statute, the Court "employ[s] canons of construction which embody sound generalizations about Congressional intent." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008). When statutory terms are undefined, courts "typically infer that Congress intended them to have their common and ordinary meaning." *Id.* at 1246. But the ordinary meaning of a term will yield if the disputed term is a "term of art" or the context indicates that the term bears a "technical meaning." *United States v. Obando*, 891 F.3d 929, 934 (11th Cir. 2008) (quotations omitted). The Court does not look at one word or term in isolation, but rather looks to the entire statute and its context. "Statutory construction is a holistic endeavor" and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *In re Wild*, 955 F.3d 1196, 1206 (11th Cir. 2020) (quotations and citations omitted).

The Defendants argue the term "report" has a technical meaning within the Corps' Civil Works Program, in that the term only refers to communications from the Corps to Congress as part of the authorization process. Before the Corps recommends projects to Congress for authorization, the Corps is required to study alternatives to ensure the proposal is formulated

to achieve certain objectives. The Defendants argue that the effect of Section 2283(d) is to add a new requirement to the list Congress has directed the Corps to meet before selecting and presenting any project alternative to Congress to be authorized.

As the Defendants state, large sections of the Water Resources Development Act of 2007, which amended Section 2283(d), are devoted to specific authorizations in which Congress authorizes projects to be carried out in accordance with the respective reports designated within the Act. Because "[a] word or phrase is presumed to bear the same meaning throughout a text," the Court interprets "report" in Section 2283(d) in accordance with the way the term is used within the rest of the Water Resources Development Act. *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) (quotations omitted). The Court agrees with the Defendants that the term "report" has a specialized meaning in the context of the Act.

Within the Water Resources Development Act, Congress has established specific requirements for Corps' reports concerning water resources projects. As the Defendants argue, other provisions of the Act strongly suggest that the term "report" constitutes reports submitted to Congress related to the planning and authorization of water resources projects. Defs.' Reply, [Doc. 127, at 2]. These provisions discuss requirements for the Corps' reports related to water resources projects which require specific authorization from Congress.

Specifically, Section 2282a(f)(2) directs that "a report of the Chief of Engineers for a water resources project . . . shall be submitted, on completion, to – (i) the Committee on Environment and Public Works of the Senate; and (ii) the Committee on Transportation and Infrastructure of the House of Representatives." 33 U.S.C. § 2282a(f). Section 2282a(g) then states that "not later than 120 days after the date of completion of a report of the Chief of Engineers that recommends to Congress a water resources project, the Secretary [of the Army] shall . . . review the report; and . . . provide any recommendations of the Secretary regarding the water resources project to Congress." *Id.* at § 2282a(g). The Act also describes in detail the project reports, general reevaluation reports, limited reevaluation reports and feasibility reports that must be prepared for any water resources project requiring specific authorization from Congress. *See* 33 U.S.C. §§ 2215(d) and 2282(a).

The Court also interprets statutes with the "presumption against surplusage." *Garcia*, 540 F.3d at 1247. The Court "strive[s] to give effect to every word and provision in a statute when possible." *Id.* Section 2282(a)(4) specifically distinguishes between the "reports" themselves and associated environmental impact statements and mitigation plans that might also be prepared. 33 U.S.C. § 2282(a)(4). Section 2346 also expressly distinguishes between "reports," final environmental impact statements and records of decision. 33 U.S.C. § 2346. Any interpretation of Section 2283(d) as applying not only to reports but also to the Master Manual, Record of Decision, and Final

EIS would render the provisions referencing these other documents as well as "reports" superfluous.

Furthermore, the Court looks at the content of the entire statutory provision at issue and evaluates its meaning abiding by the canon *noscitur a sociis*. *Noscitur a sociis* is the "principle that statutory terms, ambiguous when considered alone, should be given related meaning when grouped together." *Garcia*, 540 F.3d at 1247. Stated differently, "a word is known by the company it keeps." *Edison*, 604 F.3d at 1309 (quotations and citations omitted). "By construing proximate statutory terms in light of one another, courts avoid giving unintended breadth to the acts of Congress." *Garcia*, 540 F.3d at 1247 (quotations and citations omitted).

Here, the entire statutory provision at issue is: "the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, **and shall not select a project alternative in any report**, unless such report contains . . . [a specific plan to mitigate damages to ecological resources]." 33 U.S.C. § 2283(d)(1) (emphasis added). This provision strongly implies that the clause "and shall not select a project alternative in any report" is closely linked to the preceding clause regarding the submission of proposals for the authorization of water resources projects to Congress. The pairing of the clauses strongly suggests that the effect of Section 2283(d) is to add a new requirement to the list Congress has directed the Corps to meet

before selecting and presenting any project alternative to Congress to be authorized.

The Plaintiffs argue that the Defendants' interpretation of Section 2283(d)(1) would make the 2007 amendment superfluous. NWF's Resp., at 13-16. Generally, if the legislature amends a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning. The Plaintiffs argue that the Defendants' interpretation of the amendment would render it meaningless because prior to 2007 Section 2283 already required mitigation plans in reports submitted to Congress as part of the authorization process and already required that the Corps consider and select among project alternatives. NWF's Resp., at 13-16. But the Court agrees with the Defendants that the amendment broadens the type of reports to which the mitigation plan requirement applies. Before 2007, the requirement only applied to new requests for authorization. *See* S. Rep. 99-126, at 24-26 (1986) (describing the original Section 2283(d) as applying to "all future proposals for water resources projects submitted to Congress by the Secretary for authorization"). The Court agrees with the Defendants that the 2007 amendment expanded the provision to expressly include other types of reports in which a project alternative is selected, most notably reevaluation reports submitted to Congress to change an authorized project. *See* 153 Cong. Rec. S11981 (Sept. 24, 2007) (statement of Sen. Boxer)

("[T]he increased mitigation requirements apply to all new studies and any other project that must be reevaluated for any reason.").

The Court's interpretation of Section 2283(d) as applying only to "reports" submitted to Congress is also consistent with the Corps' congressionally mandated guidance implementing the statute. The 2009 implementation guidance confirms that the provision at issue references the selection of project alternatives in reports submitted to Congress. The guidance describes Section 2283(d) as "ensur[ing] that any report, *submitted to Congress for authorization, shall not select a project alternative unless such report contains* (1) a specific recommendation with a specific plan to mitigate fish and wildlife losses or (2) the Secretary determines that the project will have negligible adverse impacts." *See* U.S. Army Corps of Engineers, Memorandum for Commanders re; Implementation Guidance for Section 2036(a) [33 U.S.C. § 2283(d)] of the Water Resources Development Act of 2007 (WRDA 07) – Mitigation for Fish and Wildlife and Wetlands Losses (31 Aug. 2009) at 1.10 (emphasis added).

In addition to the canons of construction, the Court may turn to legislative history as an interpretive aid to clarify a statute's ambiguous or vague terms. *See Garcia*, 540 F.3d at 1247. But "legislative history cannot be used to contradict unambiguous statutory text or to read an ambiguity into a statute which is otherwise clear . . . ." *Id.* "When we consult legislative history, we do so with due regard for its well-known limitations and dangers." *Id.*

Here, the amendment's legislative history supports the Court's interpretation of the statute. As highlighted by the Defendants in their Reply, the Senate version of the bill that would have expanded the Section 2283(d) mitigation plan requirement to any final "record of decision, environmental impact statement, or environmental assessment" was rejected in conference. *See* S. Rep. 110-58 (April 30, 2007). The House version would not have expanded the requirement at all. *See* H.R. Rep. 110-80, at 20 (Mar. 29, 2007). The Conference Committee ultimately chose to limit the requirement to "reports" while broadening it to include any report in which a project alternative was selected. As the Defendants state, the Plaintiffs' proposed interpretation would appear to undo this compromise by interpreting the language of the amendment to have the meaning the Conference Committee rejected.

Based on these interpretative principles, the Court concludes that the Master Manual, Record of Decision and Final EIS do not constitute "reports" under the Water Resources Development Act of 2007 because they are not documents submitted to Congress for authorization of a water resources project or project alternative. Thus, the Court grants the Defendants' Motion for Partial Judgment on the Pleadings as to Count II of the Plaintiffs' Complaint.

2.      **Defendants' Motion for Partial Judgment on the Pleadings Regarding Count III**

In Count III, the Plaintiffs allege that the Corps failed to comply with the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. §§ 661 *et seq.* by failing to treat "fish and wildlife conservation" as a "co-equal purpose" of ACF reservoirs and by failing to give fish and wildlife conservation equal consideration to other project purposes in the updated Master Manual. NWF's Compl., at ¶¶ 234-240. The Plaintiffs argue that the Corps "improperly prioritizes certain project purposes (navigation, hydropower, water supply) at the expense of fish and wildlife conservation" by interpreting its obligations pursuant to the fish and wildlife conservation purpose as relating only to species listed under the federal Endangered Species Act. *Id.* at ¶ 223. In their Motion for Partial Judgment on the Pleadings, the Defendants argue that Count III should be dismissed because it fails to allege a violation of substantive duties under the Fish and Wildlife Coordination Act. [Doc. 116-1, at 16-19]. The Courts agrees.

In Count III of their Complaint, the Plaintiffs fail to cite to specific sections of the Fish and Wildlife Coordination Act of which they are alleging violations. NWF's Compl., at ¶¶ 234-240. At some point in the Complaint the Plaintiffs do cite to Sections 661 and 662. *Id.* at ¶ 220. But the Plaintiffs allege violation of a substantive duty that does not exist under Section 661. Section 661 imposes no duty on the Corps. Section 661 states:

> For the purpose of recognizing the vital contribution of our wildlife resources to the Nation, the increasing public interest and significance thereof due to expansion of our national economy and other factors, and to provide that wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource development programs through the effectual and harmonious planning, development, maintenance, and coordination of wildlife conservation and rehabilitation for the purposes of this Act in the United States, its Territories and possessions, the Secretary of the Interior is authorized . . .

16 U.S.C. § 661.  As the Defendants state, "where the text of a clause itself indicates that it does not have operative effect . . . a court has no license to make it do what it was not designed to do." *District of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008). Here, the text of the statute is clear. Section 661 grants limited new authorities to the Secretary of the Interior. It unambiguously imposes no duty over the Corps. The Plaintiffs' claim is based on a phrase extracted from the prologue to Section 661, which creates no mandate requiring the Corps to give "equal consideration" to fish and wildlife conservation as a "co-equal purpose" of all Corps projects. Because Section 661 does not impose any duty on the Corps, the Plaintiffs fail to state a claim upon which relief can be granted based on Section 661 of the Fish and Wildlife Coordination Act.

The Plaintiffs cite to Section 662 in their Complaint, without reference as to which provision of Section 662 they are alleging violations. In their Response, the Plaintiffs clarify that they are not asserting a claim seeking structural modification on the project under Section 662(c), nor are they

asserting a claim under Section 663. NWF's Resp., at 24. The Plaintiffs then include an unexplained reference to Section 662(b). *Id.* at 24.

But Section 662(b) provides no support to the Plaintiffs' argument in Count III that fish and wildlife conservation is a "coequal purpose" of the ACF Reservoirs entitled to "equal consideration." This provision requires the Corps to consult with fish and wildlife agencies and to consider their recommendations in deciding whether to recommend a project for authorization by Congress or to issue a Section 404 permit authorizing construction of a dam. All that Section 662(b) requires is that the Corps consult with the appropriate state and federal resource agencies; include their recommendations as an "integral component" of any report submitted to Congress; and give "full consideration" to such recommendations when making a decision. 16 U.S.C. § 662(b). But the Plaintiffs' claim alleges that the Corps failed to recognize the full extent of its authority to modify the ACF projects to benefit fish and wildlife at the expense of other project purposes and failed to weigh fish and wildlife equally with authorized project purposes, not that the Corps failed to give "full consideration" to fish and wildlife recommendations. *See* NWF's Compl., at ¶ 223 (alleging "the Corps improperly prioritizes certain project purposes (navigation, hydropower, water supply) at the expense of fish and wildlife conservation"). Thus, because the Plaintiffs fail to allege violations of the Fish and Wildlife Coordination Act, Count III should be dismissed.

**B.    Motion for Partial Judgment on the Pleadings Regarding Alabama's Complaint**

The Georgia Water Supply Providers move under Rule 12(c) for judgment on the pleadings as to Count III of Alabama's Complaint which alleges violations of the Clean Water Act and a Corps' guidance document. The Georgia Water Supply Providers also move for judgment as to Count V of Alabama's Complaint to the extent it relies on the same alleged violations.

In its Complaint, Alabama asserts that the Master Manual for the ACF River Basin should be set aside because it will cause Georgia's water quality standards to be violated in certain portions of the Chattahoochee River below Buford Dam. Alabama argues that the Master Manual is contrary to the Clean Water Act and the Corps' guidance document. Ala. Compl., at ¶¶ 95-99. Specifically, in Count III, Alabama alleges that Section 313(a) of the Clean Water Act, 33 U.S.C. § 1323(a), and the Corps' Engineering Regulation, ER 1110-2-8154, require the Corps to implement a water-quality management program that among other things, "[e]nsure[s] that water quality, as affected by the project and its operation, is suitable for project purposes, existing water uses, and public health and safety and is in compliance with applicable Federal and state water quality standards." Ala. Compl., ¶ 96 (citing WATER QUALITY AND ENVIRONMENTAL MANAGEMENT FOR CORPS CIVIL WORKS PROJECTS, ER 1110-2-8154, (May 31, 1995)). Alabama also alleges that the Corps' regulations and guidance require it to "[e]nsure that the project and its operation offer the lowest stress possible on the aquatic environment." *Id.* In Count V, Alabama

alleges violations of the Administrative Procedure Act partially based on these alleged violations of the Clean Water Act. *Id.* at ¶¶ 104-105.

The Georgia Water Supply Providers argue that Count III should be dismissed for two reasons. Defs.' Motion for Partial Judgment regarding Ala.'s Compl., [Doc. 117-1, at 10-11]. First, Alabama has failed to identify any Clean Water Act requirement that applies to the Corps. *Id.* at 11-13. Second, the Corps' Engineering Regulation is not enforceable by a third party. *Id.* at 13-18.

### 1.  Section 313(a) of the Clean Water Act

The Defendants argue that Alabama does not state a claim under Section 313(a) of the Clean Water Act because Georgia's water quality standards are not "requirements" with which federal facilities must comply. *Id.* at 11-13. The Court agrees. Section 313(a) does not qualify as a requirement in and of itself. *See New York v. United States*, 620 F. Supp. 374, 382-85 (E.D.N.Y. 1985) (explaining that Section 313(a) does "not expand the category of applicable substantive requirements with which federal facilities must comply under § 313"). Section 313(a) requires that federal facilities comply with any applicable Clean Water Act requirements that might exist "to the same extent as any nongovernmental entity," 33 U.S.C. 1323(a), holding agencies to the same standards "as if they were private citizens." *Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1332 (10th Cir. 2007) (quotations omitted). As the Defendants state, Georgia's water quality standards are not

self-enforcing, rather they provide the basis for specific, enforceable requirements designed to achieve them. [Doc. 117-1, at 11].

To state a claim under Section 313(a), Alabama must allege that the Corps has violated an applicable "requirement" in developing the Master Manual. The Supreme Court has stated that the requirements that can be enforced against federal agencies under Section 313(a) are limited to objective state standards of control, such as effluent limitations in permits, compliance schedules and other controls on pollution applicable to dischargers. *See EPA v. California*, 426 U.S. 200, 215 (1976). As the Defendants point out, most Clean Water Act requirements ultimately arise from the foundational requirement to obtain a permit before discharging any pollutant into waters of the United States. 33 U.S.C. § 1311(a). Each permit must include effluent limitations and other requirements sufficient to protect water quality standards. *See* 33 U.S.C. § 1311(b)(1)(C).

Under the Clean Water Act, "point sources" are "discrete places where pollutants are discharged, like a drainpipe at a wastewater treatment plant." *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 289 (3d Cir. 2015). States place limits on the discharge of point sources, through a permitting system known as the National Pollution Discharge Elimination System or "NPDES." 33 U.S.C. §1342. Without an NPDES permit issued by the State, no point source may "discharge . . . any pollutant." *Id.* § 1311(a) Any permit specifies the "effluent limitations" to which the entity's operations must adhere. *Id.* §

1312. Section 401 of the Clean Water Act, 33 U.S.C. § 1341, is also often a source of enforceable "requirements" applicable to federal agencies. Section 401 provides that whenever a federal agency issues any license or permit for any activity that may result in a discharge of pollutants into jurisdictional waters, the state in which the activity occurs may issue a Section 401 Certification imposing any conditions necessary to protect water quality standards.

As the Defendants argue and Alabama concedes, the dams in the ACF reservoir are considered "nonpoint sources" under the Clean Water Act. *See, e.g., Los Angeles County Flood Control Dist. v. Nat'l Res. Def. Council*, 568 U.S. 78, 82 (2012) ("discharge of pollutants" does not occur when water "flows from one portion of a river that is a navigable water of the United States, through a concrete channel or other engineered improvement in the river," and then "into a lower portion of the same river"); *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 183 (D.C. Cir. 1982) (holding that dams are not subject to NPDES permit requirements under the Clean Water Act). Nonpoint sources are "diffuse sources of pollution, like farms or roadways, from which runoff drains into a watershed." *Am. Farm Bureau Fed'n*, 792 F.3d at 289. The Sixth Circuit has recognized that the "EPA has consistently treated dams as nonpoint sources of pollution." *United States ex rel. TVA v. Tenn. Water Quality Control Bd.*, 717 F.2d 992, 999 (6th Cir. 1983). Nonpoint sources are not subject to NPDES permits, Section 401 Certification requirements or effluent limitations. *See*

*Ecological Rights Found. v. Pac. Gas & Elec.*, 713 F.3d 502, 505 (9th Cir. 2013).
"Point sources are subject to direct federal regulation and enforcement under
the Act." Nonpoint sources are addressed "in a separate portion of the Act
which encourages states to develop areawide waste treatment management
plans." *Oregon Nat'l Res. Council v. U.S. Forest Service* 834 F.2d 842, 849 (9th
Cir. 1987). But Alabama contends that water quality standards are a more
direct part of the current enforcement system for nonpoint sources, arguing
that state water quality standards are directly enforceable requirements under
Section 313(a).

Thus, the specific argument presented by Alabama in this case is
whether "requirements" under Section 313(a) not only include effluent
limitations but water quality standards as well. Water quality standards
"consist of the designated uses of the navigable waters involved and the water
quality criteria for such waters based upon such uses." 33 U.S.C. §
1313(c)(2)A). The Court agrees with the Defendants that water quality
standards are not directly enforceable under the Clean Water Act. *See Oregon
Nat'l Res. Council*, 834 F.2d at 850 (explaining that "it is not the water quality
standards themselves that are enforceable"). EPA's water quality standards
are not self-enforcing, rather they provide the legal basis for control decisions
under the Act. As Alabama even explains, states have "various means of
ensuring that entities do no impair water quality standards." Ala.'s Resp., at
15-17. States may create specific, enforceable "requirements" of nonpoint

sources through programs such as: "Best Management Practices" or "BMPs" to control run-off and "total maximum daily load[s]" or "TMDLs" that impose conditions on nonpoint source users. *Id.* Alabama has not identified any such "requirements" that the Corps has violated.

In *EPA v. California*, 426 U.S. 200 (1976), the United States Supreme Court discussed "requirements" under Section 313(a). Courts have understood this case to limit the "requirements" that can be enforced against federal agencies under Section 313(a) to objective state standards of control like effluent limits in permits and other prohibitions applicable to dischargers. *See, e.g.*, *Kelley for & on Behalf of Michigan v. United States*, 618 F. Supp. 1103, 1107-08 (W.D. Mich. 1985) (holding that the plaintiffs failed to identify a "requirement" under Section 313(a) because the United States Supreme Court held that the requirements language of section 313(a) and Section 118(a) of the Clean Air Act referred only to "objective state standards of control" in *EPA v. California*). In *New York v. United States*, 620 F. Supp. 374 (E.D.N.Y. 1985), the Eastern District of New York thoroughly analyzed Section 313(a) and concluded that water quality standards "fail to provide the types of substantive 'requirements' that are enforceable under . . . [Section 313(a)]," because they are not "objective, administratively predetermined effluent standard[s] or limitation[s] or administrative order[s] upon which to measure the prohibitive levels of water pollution." *Id.* at 384. The *New York* court examined both Section 313(a) and Section 505 explicitly holding that the two should be

"construed as coextensive." *Id.* at 381-84. The court held that water quality standards do not constitute "requirements" under either code section. *Id.*

Alabama cites multiple cases as support for its argument that water quality standards are "requirements" under the Clean Water Act. However, none are persuasive. Some of the cases arise from violations of Section 401 Certification or NPDES requirements, while others arise from specific state regulations adopted by states to implement these regulatory programs and not directly from the water quality standards themselves. *See, e.g.*, *S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370, 374-75 (2006) (addressing Section 401 Certification requirements as applied to hydroelectric dams); *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) (addressing the enforceability of requirements established by a NPDES permit); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, No. 4:12cv355-RH/CAS, 2013 WL 5436707, at *2 (N.D. Fla. Sept. 27, 2013) (evaluating a specific Florida statute creating a private right of action for certain violations of water-quality standards); *Ohio v. U.S. Army Corps of Eng'rs*, 259 F. Supp. 3d 732, 751-52 (N.D. Ohio 2017) (addressing Section 401 Certification requirements). The Plaintiffs cite to *North Dakota v. U.S. Army Corps of Eng'rs*, 270 F. Supp. 2d 1115, 1125 n.6 (D.N.D. 2003) for the proposition that "state water quality standards should apply to the activities of the Corps of Engineers." But there, the court recognized that "[t]here is no mechanism in the Clean Water Act for the enforcement of water quality

standards adopted by states; rather, enforcement is left to the states." *Id.* at 1124. Thus, the State of North Dakota enacted emergency legislation "to enable" the State's suit against the Corps, amending North Dakota's water quality laws to create new requirements that applied directly to Corps reservoirs. *Id.* The new legislation made it unlawful for any person, including any state or federal agency, to "reduce[] the quality" of state waters "below the water quality standards." *Id.* But as the Defendants state, Alabama has not alleged violations of a similar provision in Georgia or Alabama.

The Court agrees with the Tenth Circuit's analysis in *Center for Native Ecosystems v. Cables*, 509 F.3d 1310 (10th Cir. 2007). There, the plaintiffs challenged the Forest Service's decision to authorize livestock grazing in two national forests. The nonpoint source run-off from livestock grazing had caused the water quality standard for fecal coliform to be exceeded. *Id.* at 1332. But the Tenth Circuit held that the plaintiffs did not have a claim under Section 313(a) because the Forest Service had not violated any applicable requirement imposed by the state. *Id.* As the court explained, "Wyoming law does not make a nonpoint-source polluter a guarantor of water-quality compliance." *Id.* at 1331. Instead, Wyoming law required only that certain nonpoint sources implement BMPs to control runoff. And because the Forest Service had satisfied this obligation, it had met all applicable requirements "in the same manner, and to the same extent as any nongovernmental entity." *Id.* at 1333 (quoting 33 U.S.C. § 1323(a)). Because Alabama's claim is based on the

violation of state water quality standards rather than a specific, enforceable, legal "requirement" under Section 313(a), Alabama has failed to state a claim under 33 U.S.C. § 1323(a).

### 2.  The Corps' Engineering Regulation, ER 1110-2-8154

Next, Alabama alleges in Count III that the Master Manual is contrary to the Corps' Engineering Regulation, ER 1110-2-8154. The Defendants argue, and the Plaintiffs do not deny, that Count III should be dismissed because ER 1110-2-8154 is an internal guidance document that cannot be enforced by third parties. The Court agrees.

Courts will not review allegations of noncompliance with an agency statement that is not binding on the agency. *See National Min. Ass'n v. Sec. of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009). As the Defendants correctly state, in determining whether an agency standard has the force and effect of law, "courts have looked at: (1) the agency's expressed intentions as reflected by its characterization of the statement, (2) whether the statement was published in the Federal Register or the Code of Federal Regulations, and (3) whether the action has binding effects on private parties." *Id.*

Here, the purpose of the document is to "establish a policy for the water quality management program of the Corps civil works projects." ER 1110-2-8154 at 1 (May 31, 2018). As the Defendants state, the excerpts Alabama quotes are pulled from a paragraph identifying "general water quality management objectives" that "Divisions and districts will adopt and

implement." *Id.* at 3. An agency statement regarding factors that should be considered and "leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case"  is merely a general statement of policy without force of law. *National Min. Ass'n*, 589 F.3d at 1371. Next, the Engineering Regulation was not created in accordance with procedural requirements applicable to enforceable regulations. It was neither subject to notice and public comment, nor published in the Federal Register or Code of Federal Regulations. *Estrada v. Becker*, No. 1:16-CV-3310-TWT, 2017 WL 2062078, at *5 (N.D. Ga. May 15, 2017) ("[F]ederal regulations only have the force of law when they follow certain procedural requirements, like notice-and-comment rulemaking."). Lastly, the Engineering Regulation does not bind third parties and cannot be enforced by them against the Corps. The entire agency statement consists of policy and guidance Corps personnel "should" consider during water resources management. The guidance Alabama appears to rely on does not appear to affect any individual rights or obligations.

Numerous courts have considered the Corps' Engineering Regulations and have held that they are not enforceable. *See, e.g.*, *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1167-68 (9th Cir. 2000) (holding that the Corps' Engineering Regulation, ER 1165-2-131, was binding because it was a general policy statement rather than a substantive rule; it was not published in either the Code of Federal Regulations or the Federal Register; and it was a policy statement to guide the practice of district engineers rather

than to bind third parties"); *Pearce v. United States*, 261 F.3d 643, 648-49 (6th Cir. 2001) (finding an Engineering Regulation was not "a true regulation," but rather an unenforceable statement of policy); *Slappey v. United States*, No. 1:11-cv-93, 2013 WL 5406431, at *5 (M.D. Ga. Sept. 25, 2013) ("The Court agrees with the United States that [Engineering Regulations and Manuals] provide[] general objectives and guidelines and did not mandate any particular safety features or signs at the dam."), *aff'd sub nom. Slappey v. U.S. Army Corps of Engineers*, 571 F. App'x 855 (11th Cir. 2014); *Jones v. Rose*, No. 00-CV-1795-BR, 2008 WL 552666, at *39 (D. Or. Feb. 28, 2008) ("[T]he Engineering Regulations are not legislative in nature; do not have the force and effect of law; and, therefore, are not reviewable by the Court.").

Since ER 1110-2-8154 is not binding on the Corps, Alabama cannot enforce it. Because Alabama has failed to state a claim, the Court dismisses Count III. Portions of Count V that repeat Count III are also dismissed.

## IV.   Conclusion

For the reasons stated above, the Court GRANTS Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the National Wildlife Federation, the Florida Wildlife Federation, Apalachicola Bay and River Keeper, Inc.'s Complaint [Doc. 116], and the Court GRANTS the Defendant Georgia Water Supply Providers' Motion for Partial Judgment on the Pleadings regarding the State of Alabama's Complaint [Doc. 117].

SO ORDERED, this 22 day of May, 2020.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge